No. 22-50435

# In the United States Court of Appeals for the Fifth Circuit

La Union Del Pueblo Entero, Et al,

*Plaintiffs*

*v.*

Gregory W. Abbott, in his Official Capacity as Governor of Texas, Et al,

*Defendants*

LULAC Texas; Vote Latino; Texas Alliance for Retired Americans; Texas AFT; United States of America,

*Plaintiffs-Appellees*

*v.*

Senator Bryan Hughes; Senator Paul Bettencourt; Briscoe Cain, Texas Representative; Andrew Murr, Texas Representative,

*Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## APPELLANTS' OPENING BRIEF

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

William F. Cole
Assistant Solicitor General

Counsel for Appellants

# CERTIFICATE OF INTERESTED PERSONS

## No. 22-50435

LA UNION DEL PUEBLO ENTERO, ET AL,

*Plaintiffs*

*v.*

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS, ET AL,

*Defendants*

---

LULAC TEXAS; VOTE LATINO; TEXAS ALLIANCE FOR RETIRED AMERICANS; TEXAS AFT; UNITED STATES OF AMERICA,

*Plaintiffs-Appellees*

*v.*

SENATOR BRYAN HUGHES; SENATOR PAUL BETTENCOURT; BRISCOE CAIN, TEXAS REPRESENTATIVE; ANDREW MURR, TEXAS REPRESENTATIVE,

*Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, movants-appellants, as a governmental parties, need not furnish a certificate of interested persons.

/s/ Lanora C. Pettit
LANORA C. PETTIT
*Counsel of Record for Appellants*

i

## STATEMENT REGARDING ORAL ARGUMENT

This Court has set this case for oral argument on August 2, 2022, and Appellants request that oral argument proceed. This appeal involves a question of first impression in this Circuit over the scope of state legislators' legislative privilege in private, civil litigation. The district court's order abrogating that privilege for four members of the Texas Legislature departs from the holdings and reasoning of three other federal courts of appeals. Moreover, after Appellants exercised their right to appeal, the district court threatened Appellants' counsel with sanctions should this Court side with the district court over its sister circuits. Given the open nature of the question in this jurisdiction and the district court's threat, Appellants suggest that oral argument would be useful to the Court's decisional process as it provides guidance to the district court regarding how to proceed.

# TABLE OF CONTENTS

Certificate of Interested Persons ....................................................i

Statement Regarding Oral Argument .............................................ii

Table of Authorities ....................................................................iv

Introduction ................................................................................ 1

Statement of Jurisdiction ............................................................. 2

Issues Presented .......................................................................... 3

Statement of the Case .................................................................. 4

    I.   Factual Background ........................................................... 4

        A.  The 2020 election ...................................................... 4

        B.  The 2021 passage of S.B. 1 ........................................ 6

    II.  Procedural Background ..................................................... 10

        A.  Plaintiffs' complaint ................................................ 10

        B.  Plaintiffs' discovery requests .................................... 11

        C.  Motion practice before the district court .................... 13

Summary of Argument................................................................. 16

Standard of Review ..................................................................... 18

Argument.................................................................................... 19

    I.   Plaintiffs' Third-Party Discovery Requests Are Barred by Legislative Privilege. ....................................................... 19

        A.  The legislative privilege protects legislators from discovery into the subjective motivations for their legislative acts. .................... 19

        B.  The district court erred by ordering documents subject to legislative privilege to be produced.................................. 31

    II.  Plaintiffs' Third-Party Discovery Requests Are Barred by Attorney-Client Privilege. ................................................ 41

Conclusion.................................................................................. 47

Certificate of Service................................................................... 48

Certificate of Compliance ............................................................ 48

# Table of Authorities

**Page(s)**

**Cases:**

*Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions,*
  610 S.W.3d 911 (Tex. 2020) (per curiam) ........................................... 5

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ................................................................. 45

*In re Abbott,*
  628 S.W.3d 288 (Tex. 2021) (orig. proceeding) ................................ 9

*Acevedo-Cordero v. Cordero-Santiago,*
  958 F.2d 20 (1st Cir. 1992) ........................................................... 38

*Almonte v. City of Long Beach,*
  478 F.3d 100 (2d Cir. 2007) .......................................................... 36

*Am. Elec. Power Co. v. Connecticut,*
  564 U.S. 410 (2011) ..................................................................... 29

*Am. Trucking Ass'ns v. Alviti,*
  14 F.4th 76 (1st Cir. 2021) ...................................... 1, 16, 21, 22, 23, 24, 32, 33, 34

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ................................................................. 26, 27

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021) .......................................................... 24-25, 26

*Brown & Williamson Tobacco Corp. v. Williams,*
  62 F.3d 408 (D.C. Cir. 1995) ......................................................... 34

*Bruce v. Riddle,*
  631 F.2d 272 (4th Cir. 1980) ......................................................... 36

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ................................................................. 26, 27

*Bush v. Vera,*
  517 U.S. 952 (1996) ..................................................................... 45

*Butz v. Economou,*
  438 U.S. 478 (1978) ..................................................................... 38

*Cavallaro v. United States,*
  284 F.3d 236 (1st Cir. 2002) ......................................................... 42

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541 (1949) ................................................................ 2

*Crawford v. Marion Cnty. Election Bd.*,
   552 U.S. 181 (2006) ............................................................... 26

*Democratic Exec. Comm. of Fla. v. Lee*,
   915 F.3d 1312 (11th Cir. 2019) ............................................. 27

*Eastland v. U.S. Servicemen's Fund*,
   421 U.S. 491 (1975) ............................................................... 33

*EEOC v. Wash. Suburban Sanitary Comm'n*,
   631 F.3d 174 (4th Cir. 2011) ................................................. 34

*F.D.I.C. v. Maxxam, Inc.*,
   523 F.3d 566 (5th Cir. 2008) ................................................. 30

*Gahagan v. U.S. Citizenship & Immigr. Servs.*,
   911 F.3d 298 (5th Cir. 2018) ............................................ 34-35

*Gravel v. United States*,
   408 U.S. 606 (1972) ......................................................... 19, 34

*In re Hotze*,
   610 S.W.3d 909 (Tex. 2020) (orig. proceeding) ...................... 5

*In re Hubbard*,
   803 F.3d 1298 (11th Cir. 2015) .... 1, 3, 16, 20, 21, 22, 23, 24, 28, 32, 33, 34, 35, 36

*In re Itron, Inc.*,
   883 F.3d 553 (5th Cir. 2018) ................................................. 35

*Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*,
   849 F.3d 615 (5th Cir. 2017) ..................................17, 20- 21, 31, 32

*In re Kellogg Brown & Root, Inc.*,
   756 F.3d 754 (D.C. Cir. 2014) ................................................. 3

*Lake Country Ests., Inc. v. Tahoe Reg'l Planning Agency*,
   440 U.S. 391 (1979) ............................................................... 38

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ............................................................... 45

*Lee v. City of Los Angeles*,
   908 F.3d 1175 (9th Cir. 2018) ...........................1, 16, 21, 24, 26, 28, 29, 33, 34, 35

*Lewis v. Scott*,
   28 F.4th 659 (5th Cir. 2022) ................................................... 6

*Marceaux v. Lafayette City-Par. Consol. Gov't*,
   731 F.3d 488 (5th Cir. 2013) ................................................. 18

*Mobil Oil Corp. v. Higginbotham*,
  436 U.S. 618 (1978) ................................................................. 29

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ................................................................. 28

*In re Regents of Univ. of Cal.*,
  101 F.3d 1386 (Fed. Cir. 1996) .............................................. 44

*Richardson v. Flores*,
  28 F.4th 649 (5th Cir. 2022) ..................................................... 6

*Richardson v. Tex. Sec'y of State*,
  978 F.3d 220 (5th Cir. 2020) .................................................. 26

*Rodriguez v. Pataki*,
  280 F. Supp. 2d 89 (S.D.N.Y. 2003) ................................. 15, 34

*In re Santa Fe Int'l Corp.*,
  272 F.3d 705 (5th Cir. 2001) .................................................. 43

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ................................................ 37

*State v. Hollins*,
  620 S.W.3d 400 (Tex. 2020) (per curiam) .............................. 5

*In re State*,
  602 S.W.3d 549 (Tex. 2020) ..................................................... 6

*Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*,
  446 U.S. 719 (1980) ................................................................. 33

*Tenney v. Brandhove*,
  341 U.S. 367 (1951) ........................... 1, 16, 19, 20, 22, 29, 35, 36

*Tex. All. for Retired Ams. v. Scott*,
  28 F.4th 669 (5th Cir. 2022) ............................................... 6, 44

*Tex. Dem. Party v. Abbott*,
  961 F.3d 389 (5th Cir. 2020) .................................................. 45

*Tex. Dem. Party v. Hughs*,
  997 F.3d 288 (5th Cir. 2021) .................................................. 45

*Tex. League of United Latin Am. Citizens v. Hughs*,
  978 F.3d 136 (5th Cir. 2020) ................................................... 5

*Texas v. Holder*,
  No. 1:12-cv-128, 2012 WL 13070060 (D.D.C. June 5, 2012) ............ 30

*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351 (1997) ................................................................. 27

*United States v. BDO Seidman, LLP,*
   492 F.3d 806 (7th Cir. 2007) ................................................ 41-42, 44

*United States v. Brewster,*
   408 U.S. 501 (1972) ........................................................................ 19

*United States v. El Paso Co.,*
   682 F.2d 530 (5th Cir. 1982) ......................................................... 36

*United States v. Gillock,*
   445 U.S. 360 (1980) .................................. 20, 21, 22, 23, 24, 29, 30, 32

*United States v. Helstoski,*
   442 U.S. 477 (1979) ......................................................1, 16, 19, 36

*United States v. Herrera-Ochoa,*
   245 F.3d 495 (5th Cir. 2001) ........................................................... 4

*United States v. Johnson,*
   383 U.S. 169 (1966) ........................................................................20

*United States v. Kovel,*
   296 F.2d 918 (2d Cir. 1961) ....................................................38, 39, 43

*United States v. Newell,*
   315 F.3d 510 (5th Cir. 2002) ..................................................... 43, 46

*United States v. Nixon,*
   418 U.S. 683 (1974) ...................................................................... 37

*United States v. O'Brien,*
   391 U.S. 367 (1968) .................................................................. 25, 28

*United States v. Pipkins,*
   528 F.2d 559 (5th Cir. 1976) .................................................... 36, 43

*United States v. Segura,*
   747 F.3d 323 (5th Cir. 2014) ........................................................ 31

*United States v. Swindall,*
   971 F.2d 1531 (11th Cir. 1992) ..................................................... 33

*Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.,*
   913 F.3d 443 (5th Cir. 2019) ........................................................... 3

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) (en banc) ................................ 25, 26, 45

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ..................................................21, 22, 25, 26, 28

*Voting for Am., Inc. v. Steen,*
   732 F.3d 382 (5th Cir. 2013) ......................................................... 27

*Whole Woman's Health v. Smith*,
  896 F.3d 362 (5th Cir. 2018) ................................................ 2, 3, 18

*Wiwa v. Royal Dutch Petroleum Co.*,
  392 F.3d 812 (5th Cir. 2004) .......................................................... 18

**Constitutional Provisions, Statutes and Rules:**

U.S. Const.:

    art. I, § 6 ................................................................................... 20

    amend. I ............................................................ 10, 22, 26, 27, 28

    amend. XIV .............................................................. 10, 26, 27

Tex. Const.:

    art. IV, § 16 ............................................................................. 39

    art. IV, § 22 ........................................................................ 39, 41

28 U.S.C. § 1291 ............................................................................. 2

52 U.S.C.:

    § 10301(a) ............................................................................... 25

    § 10508 .................................................................................... 28

Tex. Elec. Code:

    § 31.003 ................................................................................... 39

    § 86.006(a-1) (2020) ................................................................ 5

    § 276.015 ................................................................................. 27

Tex. Gov't Code:

    § 306.008(a) ............................................................................ 13

    § 323.001 ................................................................................. 42

    § 323.006(a)(7)-(8) ................................................................. 42

    § 323.017(b) ............................................................................ 42

    § 402.010 ................................................................................. 41

    § 402.021 ................................................................................. 41

    § 402.042-043 ......................................................................... 41

Fed. R. Civ. P.:

    26(b)(1) .................................................................................... 35

    26(g) ........................................................................................ 16

    45(d)(3)(A)(iii) ........................................................................ 18

Fed. R. Evid. 501 ........................................................................... 20

Tex. S. Rule:

    1.01, S. Res. 1, 87th Leg., 2d C.S. (2021) ............................... 40

2.02(d), S. Res. 1, 87th Leg., 2d C.S. (2021) ......................................40

6.18, S. Res. 1, 87th Leg., 2d C.S. (2021) .........................................40

**Other Authorities:**

Becca Aaronson, *Texplainer: What Is a "Point of Order"?*, Texas
Tribune (Mar. 25, 2011), https://tinyurl.com/5c6muwt6 ...............40

Democracy Docket, *About Us: What we Do*,
https://www.democracydocket.com/about-us/ (last accessed June 21,
2022) ...................................................................................45

H.J. of Tex., 87th Leg.,:

1st C.S. 5 (2021) .....................................................................8

1st C.S. 32 (2021) ...................................................................8

2d C.S. 41-42 (2021) ...............................................................9

2d C.S. 45 (2021) ....................................................................9

2d C.S. 79 (2021) ....................................................................9

2d C.S. 184 (2021) ..................................................................9

2d C.S. 271 (2021) ..................................................................9

H. Select Comm. on Constitutional Rights & Remedies, Witness List,
Tex. H.B. 3, 87th Leg., 1st C.S. (July 10, 2021),
https://tinyurl.com/hb3witnesslist .........................................8

Lila Hassan & Dan Glaun, *COVID-19 and the Most Litigated
Presidential Election in Recent U.S. History: How the Lawsuits Break
Down*, PBS: Frontline (Oct. 28, 2020),
https://www.pbs.org/wgbh/frontline/article/covid-19-most-
litigated-presidential-election-in-recent-us-history/ .......................10

Mem. Op. of Douglas W. Kmiec, Applicability of Executive Privilege
to the Recommendations of Independent Agencies Regarding
Presidential Approval or Veto of Legislation, 10 Op. O.L.C. 176
(Dec. 22, 1986), https://tinyurl.com/3vc8wh33 .............................37

Op. of Paul D. Clement, Assertion of Executive Privilege Concerning
the Dismissal and Replacement of U.S. Attorneys, 31 Op. O.L.C. 1
(June 27, 2007), https://tinyurl.com/yc2rx3ds ...............................37

Order, *Richardson v. Flores*, No. 21A789 (U.S. June 8, 2022)..................6

Press Release, Off. of Tex. Gov., *Governor Abbott Delivers 2021 State of
the State Address* (Feb. 1, 2021),
https://tinyurl.com/abbott2021address...........................................6

ix

Press Release, Off. of Tex. Gov., Governor Abbott Holds Press
    Conference on Election Integrity Legislation (Mar. 15, 2021),
    https://tinyurl.com/abbottelectionconference.................................................6-7

Richard B. Latner, *The Kitchen Cabinet and Andrew Jackson's Advisory
    System*, 65 J. of Am. Hist. 367 (1978) ......................................................... 37

S.B. 1, Conference Comm. Rep. 3d Printing,
    https://tinyurl.com/sb1conferencecommittee ..................................................9

S.J. of Tex., 87th Leg.,:
    R.S. 2914 (2021).............................................................................................7
    1st C.S. 3 (2021) .............................................................................................8
    1st C.S. 14 (2021) ...........................................................................................8
    1st C.S. 23 (2021). ..........................................................................................8
    2d C.S. 6-7, 17-18 (2021) ............................................................................40
    2d C.S. 84 (2021) ............................................................................................8
    2d C.S. 182 (2021) ..........................................................................................9
    2d C.S. 188 (2021) ..........................................................................................9
    2d C.S. 268 (2021) ................................................................................... 9, 45

S. Comm. on State Affairs, Witness List, Tex. S.B. 1, 87th Leg., 1st
    C.S. (July 10, 2021), https://tinyurl.com/sb1witnesslist..............................8

Tex. Gov. Proclamation:
    No. 41-3752, 45 Tex. Reg. 5449 (2020) ........................................................4
    No. 41-3772, 45 Tex. Reg. 7073 (2020) ........................................................5
    No. 41-3848, 46 Tex. Reg. 4233 (2021) ........................................................7
    No. 41-3852, 46 Tex. Reg. 5109 (2021) ........................................................8

Tex. H.B. 6, 87th Leg., R.S. (2021) ....................................................................7

Tex. H. Select Comm. on Constitutional Rights & Remedies,
    Summary of Comm. Action, 87th Leg., 2d C.S. (Aug. 23, 2021),
    https://tinyurl.com/sb1committeesummary.....................................................9

Tex. S.B. 7, 87th Leg., R.S. (2021) ....................................................................7

Tex. Sec'y of State, Election Advisory No. 2020-14, *COVID-19
    (Coronavirus) Voting and Election Procedures* (2020),
    https://tinyurl.com/mr9kmxpk .......................................................................4

United States Letter of Consent, *LULAC Texas v. Hughes*,
    No. 22-50435 (5th Cir. June 8, 2022) ...........................................................30

Unopposed Motion to Expedite the Appeal, *Tex. State League of United Lat. Am. Citizens v. Scott*, No. 22-50435 (5th Cir. June 7, 2022) ........................11, 27

3 *Weinstein's Federal Evidence* § 503.15[3] (J.M. McLaughlin, ed., 2d ed. 2002) ................................................................................................................42

## Introduction

This appeal arises out of one of a series of constitutional and statutory challenges to the Texas Election Integrity Act of 2021, Senate Bill 1, 87th Leg., 2d C.S., commonly known under the moniker "S.B. 1," which have been consolidated before the district court. A subset of the plaintiffs in those consolidated actions sought intrusive discovery into the subjective motivations of four members of the Texas Legislature who voted on S.B. 1 but who are not parties to the underlying lawsuit. Breaking with the decisions of three of this Court's sister circuits, the district court ordered those Legislators to disclose nearly 300 confidential documents notwithstanding the Legislators' assertion of various privileges from disclosure. Because it is "not consonant with our scheme of government for a court to inquire into the motives of legislators," *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951), this Court should reverse the district court's order compelling the Legislators to reveal confidential information protected by both the legislative and attorney-client privilege.

For centuries, the legislative privilege has "protect[ed] 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts'" and "preclude[d] any showing of how [a legislator] acted, voted, or decided." *United States v. Helstoski*, 442 U.S. 477, 489 (1979) (third alteration in original) (citation omitted). Three of this Court's sister circuits have applied that privilege in private, civil litigation to shield state legislators from third-party discovery probing the motivations for legislative action. *Am. Trucking Ass'ns v. Alviti*, 14 F.4th 76, 87 (1st Cir. 2021); *Lee v. City of Los Angeles*, 908 F.3d 1175, 1186-88 (9th Cir. 2018); *In re Hubbard*, 803 F.3d 1298, 1305 (11th Cir. 2015). The district court erred

in splitting from these precedents in favor of an amorphous five-factor test developed by an out-of-circuit district court.

The district court further erred by holding that the Legislators waived the attorney-client privilege when their staff communicated with attorneys in the Office of the Lieutenant Governor (who under Texas law also serves as the President of the Senate), the Office of the Attorney General (who under Texas law may advise the State and its officers and must represent them in certain forms of litigation), and the Texas Legislative Council (which under Texas law is a legislative agency that provides a pool of resources for legislators, including legal expertise). All three should have been considered agents of the Legislators for the purpose of any privilege analysis. But even if that were not true, the common-interest doctrine preserves the confidentiality of such attorney-client communications where, as here, all parties share an interest in the passage of legally sound election-based legislation. The court's conclusion that the common-interest doctrine is inapplicable because the Legislators, Lieutenant Governor, Attorney General, and Texas Legislative Council could not plausibly conclude that S.B. 1 would be subject to a future lawsuit ignores the reality that major election-based legislation is frequently subject to legal challenge.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1291 pursuant to the collateral-order doctrine. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546-47 (1949). This Circuit has held that orders enforcing third-party subpoenas against nonparties are such collateral orders, *Whole Woman's Health v. Smith*, 896 F.3d 362, 367-69 (5th Cir. 2018), because they "(1) conclusively determine the disputed

2

question, (2) resolve an important issue completely separate from the merits of the action, and (3) [are] effectively unreviewable on appeal from a final judgment," *Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 448 (5th Cir. 2019); *see also Hubbard*, 803 F.3d at 1305 (collecting and applying governing Fifth Circuit authorities allowing a non-party to appeal an adverse privilege ruling). Specifically, the district court's order is "conclusive . . . such that failure" to produce the documents at issue "may result in sanctions against" the Legislators. *Smith*, 896 F.3d at 367. It "resolves important" issues over the scope of the legislative privilege and common-interest doctrine "separate from the merits of the litigation" over the legality of S.B. 1. *Id.* And forced disclosure of privileged documents "is 'effectively unreviewable' on appeal from the final judgment," *id*, because by then "the cat is out of the bag," *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014) (Kavanaugh, J.). That is particularly true here because the Legislators are nonparties.

## Issues Presented

1. Whether the legislative privilege shields state legislators from third-party discovery in private, civil litigation seeking to probe their subjective intent concerning the passage of legislation.

2. Whether the attorney-client privilege or common-interest doctrine protects the confidentiality of communications between legislators and legislative and executive branch attorneys involving legal advice regarding pending legislation.

## Statement of the Case

### I. Factual Background[1]

#### A. The 2020 election

The 2020 election was unprecedented because of the COVID-19 pandemic, which precipitated a global health crisis in Texas and throughout the world. *See* ROA.6540. Statewide, Governor Greg Abbott extended the early-voting period ahead of the November 2020 general election and allowed counties to accept hand-delivery of mail-in ballots before Election Day. *See* Tex. Gov. Proclamation No. 41-3752, 45 Tex. Reg. 5449, 5456 (2020). And the Texas Secretary of State provided detailed guidance to local officials regarding the administration of the election during the pandemic. *See* Tex. Sec'y of State, Election Advisory No. 2020-14, *COVID-19 (Coronavirus) Voting and Election Procedures* (2020), https://tinyurl.com/mr9kmxpk.

In addition, local election officials in Harris County experimented with alternative voting rules that had never been authorized by state law. These included keeping voting sites open beyond the hours authorized by the Legislature, allowing voters to remain in their cars rather than enter into voting places monitored by poll watchers,

---

[1] Although the Legislators do not concede that plaintiffs' allegations are true, this Factual Background is drawn from the relevant, operative complaint, ROA.6527-91, matters submitted in connection with the underlying motion to compel, ROA.9096-9121, and materials of which the Court may take judicial notice, *see United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001).

creating multiple "drop boxes,"[2] and sending out mass mailings of unsolicited applications to vote by mail. *See* ROA.6529, 6561.

None of these alternate voting rules was contemplated by state law, and many proved to be quite controversial. For example, Harris County's original plan to "educate residents about their voting options," ROA.6529, included an effort to send unsolicited applications to all 4 million registered voters in the county that was held to be illegal, *State v. Hollins*, 620 S.W.3d 400, 409 (Tex. 2020) (per curiam).[3] Harris County's drive-through voting similarly prompted a legal challenge, which was never adjudicated on the merits. *See In re Hotze*, 610 S.W.3d 909 (Tex. 2020) (orig. proceeding) (Devine, J., dissenting from denial of mandamus relief and emergency stay). Governor Abbott, by proclamation, declared that ballots could be delivered during early voting only at one location per county, Tex. Gov. Proclamation No. 41-3772, 45 Tex. Reg. 7073, 7080 (2020)—a decision upheld by both this Court and the Texas Supreme Court, *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 146 (5th Cir. 2020); *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 923 (Tex. 2020) (per curiam).

---

[2] Plaintiffs' use of the term "drop box" is imprecise. Texas law has never allowed an unmanned, off-site "drop box"—only that a "voter may deliver a marked ballot in person to the early voting clerk's office." Tex. Elec. Code § 86.006(a-1) (2020).

[3] Because the State learned of the conduct only after applications were sent to those over 65, the legality of *that* action was not addressed. *Hollins*, 620 S.W.3d at 404-05 nn.15, 17.

Texas was also hit with numerous lawsuits insisting that its voting laws were suppressing the vote of minorities and/or populations particularly vulnerable to the pandemic. *E.g.*, *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669 (5th Cir. 2022) ("*TARA*"); *Lewis v. Scott*, 28 F.4th 659 (5th Cir. 2022); *Richardson v. Flores*, 28 F.4th 649 (5th Cir. 2022); *In re State*, 602 S.W.3d 549, 552 n.13 (Tex. 2020). Though the State has to date defended its laws against all challengers, some of that litigation is still pending. *E.g.*, Order, *Richardson v. Flores*, No. 21A789 (U.S. June 8, 2022) (granting until August 13, 2022 to file petition for writ of certiorari); *Tex. Democratic Party v. Abbott*, No. 5:20-CV-00438-FB (W.D. Tex.) (post-remand motion to dismiss pending). Even where it has been resolved, the State was able to (successfully) defend those laws only at the cost of significant state resources.

In the end, more than 11 million Texans cast votes in the 2020 general election—the most in Texas history. ROA.6541. And voter turnout increased in some of the State's most populous counties. ROA.6541-42.

## B. The 2021 passage of S.B. 1

In his 2021 State of the State address, Governor Abbott announced that "Election Integrity w[ould] be an emergency item" during that year's legislative session. Press Release, Off. of Tex. Gov., *Governor Abbott Delivers 2021 State of the State Address* (Feb. 1, 2021), https://tinyurl.com/abbott2021address. The next month, Governor Abbott "held a press conference in Houston on the importance of election integrity legislation," during which he noted that "[i]n the 2020 election, we witnessed actions throughout our [S]tate that could risk the integrity of our elections and enable voter fraud." Press Release, Off. of Tex. Gov., Governor Abbott Holds

Press Conference on Election Integrity Legislation (Mar. 15, 2021), https://tinyurl.com/abbottelectionconference. Consistent with the Governor's statements, election integrity was a priority item for the 87th Legislature.

### 1. Regular session

In the regular session of the 87th Legislature, the Texas Senate introduced S.B. 7, entitled "AN ACT relating to elections, including election integrity and security; creating a criminal offense; providing civil penalties." Tex. S.B. 7, 87th Leg., R.S. (2021). The Texas House of Representatives introduced a companion bill. Tex. H.B. 6, 87th Leg., R.S. (2021). Designed as omnibus bills to address (among other things) irregularities observed during the 2020 election, each bill made several changes to the Election Code, and both were referred to their respective Senate and House committees. ROA.6549-50.

Over the next 10 weeks, the committees considered the bills. *See* ROA.6549-55. The process eventually produced a conference committee report in the Senate, which was designated CSSB 7. S.J. of Tex., 87th Leg., R.S. 2914 (2021). CSSB 7 was sent to the House on the final day of the regular session, and many House members chose to walk out of the chamber, "denying the Bill's advocates the quorum necessary to pass legislation" and running out the clock on the legislative session. ROA.6530.

### 2. First called session

Governor Abbott called a special session to commence on July 8, 2021, to once again take up "[l]egislation strengthening the integrity of elections in Texas." Tex. Gov. Proclamation No. 41-3848, 46 Tex. Reg. 4233, 4238 (2021). Both the House

and Senate introduced new versions of their previous election-integrity bills; CSSB 7 was retitled S.B. 1, and H.B. 6 was retitled H.B. 3. The bills were immediately referred to their respective committees. H.J. of Tex., 87th Leg., 1st C.S. 5 (2021); S.J. of Tex., 87th Leg., 1st C.S. 3 (2021). Those committees held public hearings. S. Comm. on State Affairs, Witness List, Tex. S.B. 1, 87th Leg., 1st C.S. (July 10, 2021), https://tinyurl.com/sb1witnesslist; H. Select Comm. on Constitutional Rights & Remedies, Witness List, Tex. H.B. 3, 87th Leg., 1st C.S. (July 10, 2021), https://tinyurl.com/hb3witnesslist.

Once public testimony was complete, the bills were advanced out of both committees with favorable reports. H.J. of Tex., 87th Leg., 1st C.S. 32 (2021); S.J. of Tex., 87th Leg., 1st C.S. 14 (2021). The next day, however, Democratic House members broke quorum and left the State to prevent H.B. 3's passage. ROA.6558. For its part, the Senate passed S.B. 1. S.J. of Tex., 87th Leg., 1st C.S. 23 (2021). Ultimately, neither bill became law.

### 3. Second called session

Because the walkout of Democratic members of the House prevented votes on several significant pieces of legislation during the first special session, Governor Abbott called a second special session to commence on August 7, which would consider—among other things—legislation "strengthening the integrity of elections in Texas." Tex. Gov. Proclamation No. 41-3852, 46 Tex. Reg. 5109, 5115 (2021). Several days later, the Senate passed CSSB 1, and S.B. 1 was engrossed. S.J. of Tex., 87th Leg., 2d C.S. 84, 86 (2021). This version of S.B. 1 was sent to the House and

referred to the Select Committee on Constitutional Rights and Remedies. H.J. of Tex., 87th Leg., 2d C.S. 41-42 (2021).

After considerable acrimony—and litigation that led to a ruling from the Texas Supreme Court that the House could arrest members who did not report to work, *In re Abbott*, 628 S.W.3d 288, 292 (Tex. 2021) (orig. proceeding)—Democratic House members who had broken quorum returned to the Capitol, and the House resumed its business, H.J. of Tex., 87th Leg., 2d C.S. 45 (2021). The Select House Committee filed a favorable report of S.B. 1 as substituted. H.J. of Tex., 87th Leg., 2d C.S. 184 (2021); Tex. H. Select Comm. on Constitutional Rights & Remedies, Summary of Comm. Action, 87th Leg., 2d C.S. (Aug. 23, 2021), https://tinyurl.com/sb1committeesummary.

S.B. 1 passed the House with some changes. H.J. of Tex., 87th Leg., 2d C.S. 79, 93, 103, 104, 105, 110-11, 118, 140, 152, 162, 167-68, 187 (2021). The Senate rejected the House amendments, and a conference committee was appointed. H.J. of Tex., 87th Leg., 2d C.S. 271 (2021).

The conference committee filed a report. S.J. of Tex., 87th Leg., 2d C.S. 182 (2021); S.B. 1, Conference Comm. Rep. 3d Printing, https://tinyurl.com/sb1conferencecommittee. The report became the final version of S.B. 1 and passed both the House and Senate along party lines. S.J. of Tex., 87th Leg., 2d C.S. 188 (2021). Governor Abbott promptly signed the bill into law. S.J. of Tex., 87th Leg., 2d C.S. 268 (2021).

## II. Procedural Background

### A. Plaintiffs' complaint

Consistent with the pattern seen throughout the country in 2020,[4] the ink on S.B. 1 was barely dry when the lawsuits began. In these consolidated cases, nearly three dozen individuals and groups as well as the United States have filed five separate complaints that take aim at S.B. 1. "Plaintiffs" as used in this appeal refers to LULAC Texas, Texas AFT, Texas Alliance for Retired Americans, and Vote Latino, which are the only four plaintiffs who sought to compel discovery from the third-party Legislators in this case. *See generally* ROA.9096-9121. Though the United States has asked to participate in this appeal as an appellee, it did not serve the discovery or file the motion to compel that is at issue in this appeal. *Cf.* ROA.10381 (acknowledging that the motion to compel was filed on behalf of the LULAC plaintiffs).

Plaintiffs' operative complaint, filed in January 2022, asserts four claims under the First and Fourteenth Amendments as well as sections 2 and 208 of the Voting Rights Act. ROA.6578-87. Plaintiffs have represented to this Court that the evidence at issue in this appeal is "'highly relevant' to Plaintiff-Appellees' claim under

---

[4] Lila Hassan & Dan Glaun, *COVID-19 and the Most Litigated Presidential Election in Recent U.S. History: How the Lawsuits Break Down*, PBS: Frontline (Oct. 28, 2020), https://www.pbs.org/wgbh/frontline/article/covid-19-most-litigated-presidential-election-in-recent-us-history/ ("A FRONTLINE analysis of two databases tracking lawsuits found that more than 400 election-related cases have been filed in the U.S. in 2020 by political parties, campaign committees, activists and individual voters.").

Section 2 of the Voting Rights Act." Unopposed Motion to Expedite the Appeal at 1, *Tex. State League of United Lat. Am. Citizens v. Scott*, No. 22-50435 (5th Cir. June 7, 2022). In support of that claim, plaintiffs allege that "[b]y surgically targeting election practices" employed in Harris County during the 2020 election, S.B. 1 was "intended to disproportionately restrict access to the franchise for Black and Hispanic voters." ROA.6579. Plaintiffs appear to acknowledge that S.B. 1 is "neutral on its face" but they contend that "discriminatory intent may be inferred by analyzing the context during and by which the challenged provisions were enacted, and by reviewing the challenged provisions' disproportionate racial impact." ROA.6578. Like the rest of the complaint, this claim seeks relief against a host of state and county officials, but *not* any members of the Texas Legislature. ROA.6598-6600.

## B. Plaintiffs' discovery requests

In December 2021, plaintiffs served sweeping third-party subpoenas on Senator Bryan Hughes, Senator Paul Bettencourt, Representative Briscoe Cain, and Representative Andrew Murr. ROA.9125, 9127-98. These subpoenas sought (among other things) all documents or communications (a) discussing elections in the States' six largest counties, ROA.9138-39 (listing nine counties, including Harris, Dallas, Tarrant, Bexar, Travis, and Collin counties); (b) discussing S.B. 1 and its predecessor bills, ROA.9139; and (c) "related to the anticipated or potential effect" of those bills, ROA.9139. Plaintiffs have admitted that the purpose of this discovery is to probe those Legislators' subjective "intent in passing SB 1." ROA.9097.

The Legislators timely objected to these requests on January 1, 2022, and served supplemental responses on January 20. ROA.9200-02, 9220-84. These responses

very clearly explained that a subset of responsive documents was being withheld because they are protected from disclosure by numerous testimonial privileges including the legislative and attorney-client privilege as well as the common-interest and work-product doctrines. ROA.9224-83. Notwithstanding those objections, between February 11 and 24, the Legislators produced more than 400 relevant, nonprivileged documents in response to the third-party subpoenas. ROA.9441. Consistent with the district court's previous orders, the Legislators produced a privilege log for withheld documents on March 14. ROA.9285-9350, 9475-82.

Despite the Legislators' assertion of the legislative privilege in early January 2022, plaintiffs waited until February 22 to object that "[t]here is no legal basis to withhold documents pursuant to claims of legislative . . . privilege in this federal proceeding"—at all. ROA.9217. Finding that position untenable, the Legislators' counsel promptly offered to meet and confer on the issue. ROA.9468-69. But plaintiffs' counsel waited until April 28 to confer with the Legislators' counsel over what they belatedly assert is an overbroad assertion of privilege. ROA.9352-57. In the interim, plaintiffs' counsel also chose not to even attend depositions of three of the Legislators where they could have asked questions relating to their privilege assertions. *See* ROA.9494 (noticing the depositions occurred in mid-April).

## C.  Motion practice before the district court

On May 3—less than two weeks before the scheduled end of fact discovery[5]—plaintiffs moved to compel the production of nearly 300 privileged documents on three bases relevant to this appeal. ROA.9100-01.[6] *First*, for 139 documents, plaintiffs admitted that the documents were subject to the legislative privilege but asked the district court to vitiate that privilege by applying a five-factor balancing test developed by an out-of-circuit district court in 2003. ROA.9103-04. *Second*, plaintiffs asked the district court to hold that the Legislators *waived* the legislative privilege for 89 documents because they were shared with putatively non-legislative third parties, including the Texas Legislative Council, a legislative agency, and the Texas Lieutenant Governor, who serves as President of the Texas Senate, despite their intimate involvement in the legislative process and despite Texas law confirming both are within the legislative privilege. ROA.9110-13; *see* Tex. Gov't Code § 306.008(a). *Third*, plaintiffs challenged whether 41 documents were properly withheld on the grounds of the attorney-client privilege. As with legislative privilege, plaintiffs argued that the Legislators waived the attorney-client privilege for "several dozen documents" by communicating with attorneys in the Office of the Lieutenant Governor, the Office of the Texas Attorney General, and the Texas Legislative Council.

---

[5] Although the Court modified its scheduling order on June 7 and pushed the close of fact discovery to March 17, 2023, ROA.10500-04, at the time plaintiffs filed their motion to compel, the close of fact discovery was May 13, 2022, ROA.4193.

[6] Plaintiffs also sought 11 documents that were withheld on the ground of investigative privilege. ROA.9101. The Legislators do not appeal the district court's holding that the investigative privilege was not properly invoked.

ROA.9114-16. Plaintiffs also challenged whether three documents were properly withheld on the grounds of privilege given that they reflected information provided in furtherance of legal advice rather than legal advice itself. ROA.9115-16.

The Legislators filed their opposition on May 9, arguing that the legislative privilege protects against discovery into a legislator's motivations for acts taken during the legislative process; that a nebulous balancing test was an inappropriate analytical framework for assessing claims of legislative privilege; and that communicating with non-legislators (to the extent they were non-legislators) does not waive the privilege. ROA.9444-59. The Legislators also argued that the attorney-client privilege had not been waived because, under the common-interest doctrine, the Legislators shared a common legal interest concerning the drafting of election-based legislation with the Office of the Lieutenant Governor, Office of the Attorney General, and the Texas Legislative Council. ROA.9460-63.

Following a hearing on May 13, ROA.9412, the district court issued a sweeping order on May 25 granting plaintiffs' motion to compel and overriding the Legislators' assertions of various privileges, including legislative privilege and attorney-client privilege, ROA.10381-97. The court expressly refused to apply numerous decisions, including from the Supreme Court and this Court's sister circuits, holding that communications made as part of the legislative process and to individuals performing legislative functions are protected by the legislative privilege even if they are not employed by the Legislature. ROA.10386-90. It distinguished those authorities on the basis that they either "concerned the application of the legislative privilege to

members of Congress through the Speech and Debate Clause, not state legislators," ROA.10387, or the "distinct" concept of "legislative immunity," ROA.10389.

Instead, the district court applied plaintiffs' preferred five-part balancing test, which was announced by a district court nearly twenty years ago but apparently never subject to appellate-court testing. ROA.10391-93 (applying *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 101 (S.D.N.Y. 2003)). Applying that test to "several internal documents such as notes and drafts of election legislation as well as communications between the State Legislators and their staff," ROA.10391, the court ordered all of the relevant documents produced, vitiating the legislative privilege because "the need for accurate fact finding outweighs any chill to the legislature's deliberations," ROA.10393. In the process, the district court rejected plaintiffs' theory that sharing information with the Texas Legislative Council vitiated the privilege, ROA.10386 n.1, but the court agreed that providing documents to attorneys in the offices of the Lieutenant Governor or Attorney General breached confidentiality and thus waived legislative privilege, ROA.10388-91.

The district court also held that the attorney-client privilege had been waived for certain communications with the Office of the Lieutenant Governor, Office of the Attorney General, and the Texas Legislative Council because these individuals are not members of the Legislature, and the Legislators did not have a common legal interest with those offices in any actual or threatened litigation. ROA.10394-95. The court also held that three of the communications were never privileged because they merely contain "facts" and thus do not concern legal advice. ROA.10394-95.

The State Legislators noticed this appeal on May 26. ROA.10450-51. Counsel for the parties conferred and agreed that, to ensure an orderly appellate process, plaintiffs would not oppose a stay pending appeal, and the Legislators would not oppose a request to expedite that appeal. ROA.10458-60. The district court reluctantly granted that motion. ROA.10461-62. But it threatened to impose sanctions if the Legislators do not prevail on appeal, stating that "assuming that the Court of Appeals finds that the vast majority of documents are in fact not privileged, this Court may impose sanctions as required by Fed. R. Civ. P. 26(g)." *See* ROA.10461.

## Summary of Argument

**I.**  The legislative privilege shields legislators from discovery in private, civil litigation into the motives for their legislative acts. *Helstoski*, 442 U.S. at 489; *Tenney*, 341 U.S. at 376. Three of this Court's sister circuits have held that the legislative privilege protects state legislators from any such third-party discovery seeking to probe individual legislators' intent in passing legislation. *Alviti*, 14 F.4th at 88-90; *Lee*, 908 F.3d at 1186-88; *Hubbard*, 803 F.3d at 1311-12. Application of those precedents should have led to the denial of plaintiffs' motion to compel. There is no dispute here that plaintiffs' third-party discovery aims to discover the Legislators' individual motivations regarding the passage of S.B. 1. *See* ROA.9096-97. And, as in *Alviti*, *Lee*, and *Hubbard*, neither plaintiffs' claim under section 2 of the Voting Rights Act—nor any of the others—depends on upon proving, with direct evidence, discriminatory intent of these four Legislators who may not represent the intentions of the Legislature as a whole.

None of the district court's four reasons for departing from these precedents has merit. *First*, the district court relied on *Jefferson Community Health Care Centers, Inc. v. Jefferson Parish Government*, 849 F.3d 615 (5th Cir. 2017), while failing to grapple with the fact that the Court did not have occasion to explore the scope of the legislative privilege, making its privilege discussion dicta. Moreover, *Jefferson Community Health Care Centers'* reference to the "qualified" nature of legislative privilege refers to the Supreme Court's holding that the privilege must yield in the context of federal criminal proceedings against state legislators—a qualification wholly inapplicable to this private, civil litigation. *Second*, because the Supreme Court has generally equated the scope of the privilege afforded to federal and state legislators, precedents interpreting the scope of the federal legislative privilege under the federal Speech or Debate Clause are instructive and favor the Legislators here—as do cases interpreting the corollary concept of legislative immunity. *Third*, the ad-hoc, multi-factor balancing test adopted by the district court has not been adopted by other circuit courts and should be rejected as effectively rendering the legislative privilege nugatory. *Finally*, the legislative privilege applies to communications which are an integral part of the legislative process even if one or more participants is not a legislator.

**II.**   The district court also erred by holding that the attorney-client privilege was waived for several dozen documents in which the Legislators' staff communicated with attorneys in the Office of the Lieutenant Governor, the Office of the Attorney General, and the Texas Legislative Council. Leaving aside that a number of these communications should have been shielded as communications between legislators and their attorneys, the common-interest doctrine preserves the confidentiality of

17

such documents where the parties share a common legal interest in those communi-cations. Here, the Legislators, Lieutenant Governor, Attorney General, and Texas Legislative Council share a common interest in the passage of legally sound election legislation.

The district court's holding that such an interest is not present because the Leg-islators, Attorney General, and Texas Legislative Council were not the subjects of actual or potential litigation blinks reality: leaving aside that there were election cases actually pending from 2020 that might have been affected by changes wrought by S.B. 1, election-based legislation is always drafted under threat of litigation pursuant to the Voting Rights Act and other applicable constitutional doctrines.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 45(d)(3)(A)(iii) provides that a court "must quash or modify a subpoena" that "requires disclosure of privileged or other pro-tected matter." The Court reviews a district court's discovery orders for an abuse of discretion. *Smith*, 896 F.3d at 369 (citing *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 817 (5th Cir. 2004)). "The district court's legal conclusions should be reviewed *de novo*, and its factual findings should not be disturbed unless they are clearly erroneous." *Id.* (quoting *Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 491 (5th Cir. 2013)).

**ARGUMENT**

## I. Plaintiffs' Third-Party Discovery Requests Are Barred by Legislative Privilege.

Legislative privilege protects legislators from discovery into their motives for their legislative acts in private, civil litigation. There is no dispute here that, through this third-party discovery, plaintiffs—who are private parties—seek to probe the Legislators' subjective motivations regarding the passage of S.B. 1. Yet this is not the rare or exceptional case where the privilege should yield to plaintiffs' asserted desire for discovery, particularly as their claims do not turn on the evidence they seek. In nonetheless ordering production, the district court ignored the teachings of three of this Court's sister circuits and committed multiple analytical errors.

### A. The legislative privilege protects legislators from discovery into the subjective motivations for their legislative acts.

1.    The legislative privilege generally shields from inquiry acts of legislators and their agents undertaken when "acting in the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376. It both "protects 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts'" and "precludes any showing of how [a legislator] acted, voted, or decided." *Helstoski*, 442 U.S. at 489 (quoting *United States v. Brewster*, 408 U.S. 501, 525, 527 (1972)). The legislative process includes not only "words spoken in debate," but also "[c]ommittee reports, resolutions, and the act of voting" and "things generally done" during a Legislature's session "by one of its members in relation to the business before it." *Gravel v. United States*, 408 U.S. 606, 617 (1972). In essence, "[t]he privilege protects the legislative process itself, and therefore covers . . . legislators'

actions in the proposal, formulation, and passage of legislation." *Hubbard*, 803 F.3d at 1308.

The common-law roots of the legislative privilege run deep, stretching back to the English "Parliamentary struggles of the Sixteenth and Seventeenth Centuries," *Tenney*, 341 U.S. at 372, in particular the "conflict between the [House of] Commons and the Tudor and Stuart monarchs," *United States v. Johnson*, 383 U.S. 169, 178 (1966). But "[s]ince the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature." *Id.* At the Founding, "[f]reedom of speech and action in the legislature was taken as a matter of course," and the Framers deemed it "so essential . . . that it was written into the Articles of Confederation and later into the Constitution." *Tenney*, 341 U.S. at 372.

In the federal Constitution, the legislative privilege is reflected in the Speech or Debate Clause, which provides in relevant part that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. CONST. art. I, § 6. That federal provision was preceded by similarly robust protections in some of the earliest state constitutions. *See Tenney*, 341 U.S. at 375-77. And today, similar language appears in most state Constitutions, including Texas's. *See id.* at 375 & n.5.

Although the "Federal Speech or Debate Clause . . . by its terms is confined to federal legislators," *United States v. Gillock*, 445 U.S. 360, 374 (1980), the legislative privilege also shields state legislators in federal court via "federal common law, as applied through Rule 501 of the Federal Rules of Evidence," *Jefferson Cmty. Health*

*Care Ctrs.*, 849 F.3d at 624. "[P]rinciples of comity" undergird the application of the legislative privilege to state legislators who are haled before federal courts. *Alviti*, 14 F.4th at 87 (quoting *Gillock*, 445 U.S. at 373). So do "the interests in legislative independence," which "remain relevant in the common-law context." *Id.*

**2.** Though a question of first impression in this Court, at least three other circuits have held that the federal-common-law legislative privilege protects state or local legislators from third-party discovery seeking to probe the legislators' motivations for legislative acts in private, civil litigation. *Id.* at 88-90; *Lee*, 908 F.3d at 1186-88; *Hubbard*, 803 F.3d at 1311-12.

In *Lee*, for example, the Ninth Circuit affirmed a district-court order that prohibited plaintiffs from deposing several city councilmembers and the Mayor of Los Angeles in a racial gerrymandering case on the grounds of legislative privilege. 908 F.3d at 1181, 1186-88. The court observed that the Supreme Court "has repeatedly stressed that 'judicial inquiries into legislative or executive motivation represent a substantial intrusion' such that calling a decision maker as a witness 'is therefore usually to be avoided.'" *Id.* at 1187 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)). Even acknowledging that the case involved "serious allegations" of racial gerrymandering during the redistricting process, the Court nevertheless found no justification for "the 'substantial intrusion' into the legislative process" that authorizing the third-party discovery at issue would cause. *Id.* at 1188 (quoting *Vill. of Arlington Heights*, 429 U.S. at 268 n.18). And the court emphatically rejected the plaintiffs' "call for a categorical exception whenever a constitutional claim directly implicates the government's intent" since such an

exception "would render the privilege 'of little value.'" *Id.* (quoting *Tenney*, 341 U.S. at 377).

Similarly, in *Hubbard* the Eleventh Circuit held that a district court abused its discretion in failing to quash third-party subpoenas duces tecum that were served on legislators and executive branch officials in a First Amendment retaliation case. 803 F.3d at 1308. The Eleventh Circuit rejected the district court's reliance on a multi-factor balancing test, *id.*, and instead concluded that "[t]he privilege applies with full force against requests for information about the motives for legislative votes and legislative enactments," *id.* at 1310. Because "[t]he subpoenas' only purpose was to support the lawsuit's inquiry into the motivations" of legislators, the court concluded that it "str[uck] at the heart of the legislative privilege." *Id.*

The Eleventh Circuit recognized that "a state lawmaker's legislative privilege must yield in some circumstances where necessary to vindicate important federal interests such as 'the enforcement of federal criminal statutes.'" *Id.* at 1311 (quoting *Gillock*, 445 U.S. at 373). But it concluded that the privilege is less likely to give way in "civil actions by private plaintiffs" than in "criminal prosecutions by the federal government." *Id.* at 1312. And it was not overcome in the case before it: private, civil litigation challenging an "otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it." *Id.*

Most recently, in *Alviti* the First Circuit applied the legislative privilege to reverse the denial of motions to quash subpoenas that "sought evidence of [Rhode Island] State Officials' legislative acts and underlying motives." 14 F.4th at 87. The court observed that "federal courts will often sustain assertions of legislative

privilege by state legislatures except when 'important federal interests are at stake,' such as in a federal criminal prosecution." *Id.* (quoting *Gillock*, 455 U.S. at 373). The question before the court was whether the district court erred in concluding that discovery into "the State Officials' subjective motives outweighed the comity considerations implicated by the subpoenas." *Id.* at 88. The First Circuit held they did not, reasoning that "mere assertion of a federal claim" was not sufficient to overcome the privilege and concluding that if it were "the privilege would be pretty much unavailable largely whenever it is needed." *Id.* The court also held that "proof of the subjective intent of state lawmakers is unlikely to be significant enough in this case to warrant setting aside the privilege" where the claim did not turn on such evidence. *Id.* at 88-89. It also noted that the Supreme Court "has warned against relying too heavily on . . . evidence" of subjective intent, which "is often less reliable and therefore less probative than other forms of evidence bearing on legislative purpose." *Id.* at 90.

**3.**    A straightforward application of these precedents should have led to a denial of plaintiffs' motion to compel. There can be no dispute that plaintiffs seek "information about the motives for legislative votes and legislative enactments." *Hubbard*, 803 F.3d at 1310. Indeed, plaintiffs conceded below that they sought to compel production of documents that will "show legislative purpose" and "reveal [the Legislators'] intent in passing SB 1" because they believe "the legislature's intent and purpose in enacting S.B. 1 are deeply relevant to [their] claims." ROA.9096-97; *accord* ROA.9139 (discovery request seeking production of "[a]ll documents and communications related to the anticipated or potential effect of SB 1, SB 7, HB 3, or HB 6,

including the effect on voter turnout and wait times at polling places"). In other words, these third-party "subpoenas' only purpose was to support the lawsuit's inquiry into the motivations behind" S.B. 1—"an inquiry that strikes at the heart of the legislative privilege." *Hubbard*, 803 F.3d at 1310.

The information that plaintiffs seek thus falls within the heartland of the legislative privilege. And plaintiffs' "mere assertion of a federal claim," *Alviti*, 14 F.4th at 88, or even the assertion of "a constitutional claim [that] directly implicates the government's intent," *Lee*, 908 F.3d at 1188, is insufficient to breach the legislative privilege here. For starters, "[t]his is not a federal criminal investigation or prosecution" involving the "enforcement of federal criminal statutes," *Hubbard*, 803 F.3d at 1312, which is the only context in which the Supreme Court has held that the privilege must yield, *see Gillock*, 445 U.S. at 373.

Nor is probing any of the Legislators' individual intent relevant enough to plaintiffs' claims to justify setting aside legislative privilege. *Cf. Alviti*, 14 F.4th at 88-89 ("proof of the subjective intent of state lawmakers is unlikely to be significant enough in this case to warrant setting aside the privilege"). After all, none of the plaintiffs' four claims depends on proving, with direct evidence, discriminatory intent of these four legislators—nor could they. Discovery probing the mind of any one particular legislator is not tantamount to evidence of legislative purpose. *Cf. Lee*, 908 F.3d at 1184 (evidence about the intent of two city councilmembers could not be imputed to the Council as a whole because they "were only two people in a process that incorporated multiple layers of decisions and alterations from the entire [redistricting] Commission, as well as the City Council"); *accord Brnovich v. Democratic Nat'l*

*Comm.*, 141 S. Ct. 2321, 2350 (2021) ("the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents"); *United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it").

*First*, take plaintiffs' claim that S.B. 1 was enacted with "discriminatory purpose" in violation of section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a).[7] ROA.6578-79. Such a claim is assessed under the "framework articulated in" *Arlington Heights*, whereby a court applies "five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc). But these five factors look at *circumstantial* evidence of discriminatory purpose of the entire legislature—not the subjective intent of a subset of individual legislators. *See id.* at 231. And *Arlington Heights* itself cautions "that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government" and are therefore "usually to be avoided." 429 U.S. at 268 n.18. It acknowledged that even in "extraordinary instances" where "[t]he legislative or administrative history may be highly relevant," testimony from legislators "frequently will be barred

---

[7] Plaintiffs do not appear to assert a claim under section 2's "results test." *See Brnovich*, 141 S. Ct. at 2337-38. But even if they had, discovery into legislative intent would not be relevant to such a claim. Following the 1982 amendments to the Voting Rights Act, a section 2 "results test" claim does not "require proof of discriminatory intent." *Id.* at 2337. Instead, in considering whether, under "the totality of circumstances," voting is "equally open" to members of all races, a court weighs several nonexhaustive factors. *Id.* at 2338-40. None of those factors implicates legislative intent.

by privilege." *Id.* at 268. Consequently, this Court has noted that "[n]either *Arlington Heights* nor" its own precedent "requires direct evidence" to prove a Fourteenth Amendment claim of the type plaintiffs advance here. *Veasey*, 830 F.3d at 231 n.13. That is why *Lee* held that intrusive discovery into legislators' subjective intent was not appropriate in a case asserting racial discrimination under the Fourteenth Amendment. 908 F.3d at 1186-88.

Notably, in *Brnovich* the Supreme Court recently confirmed, in the context of a claim that voting laws were enacted with discriminatory purpose, that a law's constitutionality does not depend on the subjective intent of one (or even four) legislators because "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Id.* at 2350. That plaintiffs seek evidence from the drafter and a primary sponsor of the bill does not change the analysis here: the Supreme Court has emphatically rejected the "'cat's paw' theory" of liability as having "no application to legislative bodies." *Id.* That "theory rests on [an] agency relationship that exists between an employer and a supervisor," which simply does not exist where every individual legislator is under an obligation to exercise independent judgment regarding the passage of legislation like S.B. 1. *Id.*

*Second*, consider plaintiff's claim that S.B. 1 violates the First and Fourteenth Amendments because it unduly burdens the right to vote under the Supreme Court's *Anderson-Burdick* balancing test. ROA.6580-83. That test "requires 'a two-track approach.'" *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 233 n.26 (5th Cir. 2020) (quoting *Crawford v. Marion Cnty. Election Bd.*, 552 U.S. 181, 205 (2006) (Scalia, J., concurring)). The first track is for "State rules that impose a severe burden on First

Amendment rights," which "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). The second is for state rules that impose "[l]esser burdens" and "trigger less exacting review" under which "a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Id.* (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

But "[u]nder *Anderson-Burdick*, it is not necessary for a plaintiff to show discriminatory intent to make out a claim that the state has unconstitutionally burdened the right to vote." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 n.9 (11th Cir. 2019). Instead, the Court "'must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.'" *Steen*, 732 F.3d at 387 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Then "the court 'must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule.'" *Id.* Neither inquiry requires probing the motivations of individual legislators.[8]

*Third*, plaintiffs' First Amendment claim similarly does not require intrusive discovery into the motives of these Legislators. ROA.6583-86. Plaintiffs challenge S.B. 1's ban on vote harvesting, Tex. Elec. Code § 276.015, as a "content-based"

---

[8] Plaintiffs appear to recognize as much, asserting only that their third-party discovery from the Legislators is relevant to their "claim under Section 2 of the Voting Rights Act." *Unopposed Motion to Expedite the Appeal, supra* p. 11, at 1.

restriction on "core political speech." ROA.6583-84. But the Supreme Court has cautioned that even in the First Amendment context, "[i]nquiries into congressional motives or purposes are a hazardous matter." *O'Brien*, 391 U.S. at 383. After all, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.* at 384. For that reason, the Court has "made clear" a party bringing such a claim "need adduce no evidence of an improper censorial motive." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) (citations omitted). These well-established principles are why the Eleventh Circuit held in *Hubbard* that the subpoenas at issue must be quashed, even though lawmakers' alleged intent was at the heart of plaintiffs' First Amendment retaliation claim. 803 F.3d at 1312.

*Finally*, nothing about plaintiffs' claim under section 208 of the Voting Rights Act requires probing the subjective motivations of state legislators. ROA.6586-87. That section provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer of the voter's union." 52 U.S.C. § 10508. No part of that statute requires proof of legislative intent to establish a violation.

In sum, nothing in plaintiffs' complaint "justif[ies] the 'substantial intrusion' into the legislative process," *Lee*, 908 F.3d at 1188 (quoting *Vill. of Arlington Heights*, 429 U.S. at 268 n.18), that would be wrought by enforcing plaintiffs' third-party discovery—even where, as here, plaintiffs' section 2 claim may "implicate[] the government's intent," *id.* Were it otherwise, the legislative privilege would be displaced

any time a plaintiff's complaint puts the government's intent at issue, which would "render the privilege 'of little value.'" *Id.* (quoting *Tenney*, 341 U.S. at 377).

In many ways, this is just a specific application of the general proposition that "congressional legislation excludes the declaration of federal common law" only when "the statute 'speak[s] directly to [the] question' at issue." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)). This principle embodies the notion that it is "primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest." *Id.* at 423-24. The Supreme Court has recognized that, by criminalizing certain conduct, Congress prescribes a federal interest sufficiently strong to displace the federal-common-law protection of state legislative privilege. *Cf. Gillock*, 445 U.S. at 373 ("recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government in enforcing its criminal statutes"). By contrast, neither the Supreme Court, this Court, nor this Court's sister circuits has held that Congress's provision of a civil cause of action provides such an overriding federal interest—particularly where, as here, that cause of action does not depend upon proving the subjective intent of individual legislators. *Cf. id.* ("in protecting the independence of state legislators, *Tenney* and subsequent cases on official immunity have drawn the line at civil actions."). Drawing that line is fully consistent with the Supreme Court's repeated admonition that plaintiffs' claims in such cases cannot be proved with evidence from a handful of legislators' private thoughts, versus evidence of legislative purpose for the legislative body as a whole. *Supra* at 24-25.

**4.** To the extent that there was any doubt about the nature and extent of any federal interest here, the United States' late arrival to this legislative-privilege dispute should put it to rest. Though the consolidated action includes a complaint filed by the United States, ROA.4208-27, only the plaintiffs moved to compel production of privileged material. *See* ROA.9096-9121. As a result, the United States is not a party to the order compelling discovery, ROA.10381, and had to *ask* to be added as an appellee in this appeal for unspecified reasons, United States Letter of Consent at 1, *LULAC Texas v. Hughes*, No. 22-50435 (5th Cir. June 8, 2022). The United States' decision to not even move to compel discovery from these third-party legislators before the scheduled close of discovery, coupled with its belated effort to inject itself into this dispute, underscores the absence of any federal interest in compelling these third-party legislators to produce these legislatively privileged documents.

Even if the United States had moved to compel such third-party discovery, that would not be dispositive since the only context in which the Supreme Court has held that the privilege may be overcome is in federal *criminal* proceedings. *Gillock*, 445 U.S. at 373; *see, e.g.*, *Texas v. Holder*, No. 1:12-cv-128, 2012 WL 13070060, at *1 (D.D.C. June 5, 2012) (three-judge district court) (applying legislative privilege to shield disclosure of documents from Texas legislators in response to a motion to compel filed by the United States Attorney General in a Voting Rights Act case). Congress indicates a different type of federal interest when it chooses civil rather than criminal enforcement mechanisms (or vice versa). *Cf. F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 592 (5th Cir. 2008) (allowing the federal government to simultaneously pursue civil and criminal enforcement because "different interests [are]

promoted by different regulatory provisions"). And for the reasons discussed above, Congress has not expressed a federal interest sufficient to overcome the federal-common-law legislative privilege in this instance.

### B. The district court erred by ordering documents subject to legislative privilege to be produced.

The district court's order departed from the approach of this Court's sister circuits to find such a compelling federal interest for four interrelated reasons. None has merit.

#### 1. The district court misread dicta from this Court's prior decisions.

As an initial matter, the district court was wrong to depart from the holdings of the First, Ninth and Eleventh Circuits based on a misapplication of this Court's statement in *Jefferson Community Health Care Centers* that "the privilege accorded to state legislators is qualified." ROA.10385 (citing 849 F.3d at 624). *Jefferson Community Health Care Centers*' cursory, one-paragraph discussion about legislative privilege is dicta, which "could have been deleted without seriously impairing the analytical foundations of the holding." *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014). There, the Court found that Louisiana parish councilmembers could not object to the entry of a preliminary injunction based on legislative privilege because it is an "evidentiary privilege and cannot bar the adjudication of a claim." *Jefferson Cmty Health Care Ctrs.*, 849 F.3d at 624. Because the panel's passing description of the legislative privilege as "qualified" and "limited," *id.*, is "peripheral," it "may not have received the full and careful consideration of the court that uttered it," and it is therefore not given precedential effect. *Segura*, 747 F.3d at 328.

Regardless, *Jefferson Community Health Care Centers* provides little guidance here. As third parties, the Legislators have no need to assert the privilege to "bar the adjudication of a claim" against them. 849 F.3d at 624. And the only "qualification" of state legislative privilege recognized by the Supreme Court—that it must yield in federal criminal proceedings—does not apply here in private, civil litigation. Because the federal legislative privilege is constitutional in nature, it must be read to the full extent of its text, including in criminal matters. *See Gillock*, 445 U.S. at 369 ("In statutes subject to repeal or in judge-made rules of evidence readily changed by Congress or the judges who made them, the protection would be far less than the legislative privilege created by the Federal Constitution."). By contrast, the common-law privilege afforded to state legislators must give way to clear statutory commands such as in federal criminal prosecutions. *Id.* at 366-67, 373. Because this case is a private, civil action, not a criminal one, the "qualified" nature of the privilege is irrelevant—particularly as the application of the federal law at issue does not turn on legislative intent of these four Legislators. *Supra* at 23-29. That is why this Court's sister circuits have rejected the applicability of *Gillock* in the context of private civil actions. *See Alviti*, 14 F.4th at 88; *Hubbard*, 803 F.3d at 1311-12.

### 2. The district court erred by disregarding guidance provided by cases involving the Speech or Debate Clause and legislative immunity.

The district court was also wrong to depart from the holdings of this Court's sister circuits as well as the United States Supreme Court on the basis that those decisions either turned on the application of the federal Speech or Debate Clause or on the "distinct" concept of legislative immunity. ROA.10387-90. This distinction

is factually wrong. As discussed above, *Alviti, Hubbard*, and *Lee* all involved state or local legislators. *Supra* at 21-23. Moreover, "[a]lthough the separation-of-powers doctrine justifies a broader privilege for Congressmen than for state legislators for criminal actions," the Supreme Court "generally ha[s] equated" the scope of the privilege afforded to federal legislators via the Constitution and the privilege afforded to state legislators via the common law. *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980). For good reason: the federal-common-law legislative-privilege "is similar in origin and rationale to that accorded Congressmen under the [federal] Speech or Debate Clause." *Id.* at 732. "The rationale for the privilege—to allow duly elected legislators to discharge their public duties without concern of adverse consequences outside the ballot box—applies equally to federal, state, and local officials." *Lee*, 908 F.3d at 1187. "And the interests in legislative independence served by the Speech or Debate Clause remain relevant in the common-law context." *Alviti*, 14 F.4th at 87.

Likewise, it makes little difference that several cases addressing legislative privileges dealt with a "freedom from liability" (*i.e.*, legislative immunity) rather than a "testimonial privilege." *United States v. Swindall*, 971 F.2d 1531, 1544 (11th Cir. 1992). Immunity and privilege are "corollary" concepts that derive from the same historical tradition and advance the same essential purposes, including safeguarding legislative independence and "minimizing the 'distraction' or 'divert[ing] [legislators'] time, energy, and attention from their legislative tasks to defend the litigation.'" *Lee*, 908 F.3d at 1187 (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)).

Indeed, the concepts are symbiotic. The "[l]egislative privilege against compulsory evidentiary process exists to safeguard . . . legislative immunity and to further encourage the republican values it promotes." *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011). That is why the D.C. Circuit has concluded that there is no "difference in the vigor with which the privilege protects against compelling a [legislator's] testimony as opposed to the protection it provides against suit." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 (D.C. Cir. 1995). And it is why the Supreme Court has treated these two concepts as two sides of the same coin, holding that a legislator "may not be made to answer—either in terms of questions *or* in terms of defending himself from prosecution." *Gravel*, 408 U.S. at 616 (emphasis added). This Court's sister circuits have followed suit and treated cases involving issues of legislative immunity as instructive in cases concerning the scope of the legislative privilege. *See Alviti*, 14 F.4th at 86-87 & n.6; *Lee*, 908 F.3d at 1186-87; *Hubbard*, 803 F.3d at 1306-07, 1310-11.

### 3. The district court was wrong to discard clear, circuit-court guidance to adopt a nebulous, five-part test from an out-of-court district court.

The district court was also wrong to depart from *Hubbard, Lee*, and *Alviti*, in favor of a nebulous five-factor test developed by an out-of-circuit district court. ROA.10385, 10391-93 (quoting *Rodriguez*, 280 F. Supp. 2d at 100-01). The Court should reject that proposed test out-of-hand because it is inconsistent with the approach of this Court's sister circuits on issues of legislative privilege and this Court is "always chary to create a circuit split." *Gahagan v. U.S. Citizenship & Immigr.*

*Servs.*, 911 F.3d 298, 304 (5th Cir. 2018). Indeed, the Eleventh Circuit expressly rejected the application of a multi-factor test for purposes of adjudicating legislative-privilege claims. *Hubbard*, 803 F.3d at 1308.

Nor is the district court's balancing test persuasive on its own terms. Its test considers such factors as "the relevance of the evidence," "the availability of other evidence," and the "'seriousness' of the litigation." ROA.10385. But these factors simply mirror the general standard for discovery of non-privileged material. *See* Fed. R. Civ. P. 26(b)(1) (limiting the scope of discovery to material that is "relevant" considering, among other things, the "importance of the discovery in resolving the issues"). A privilege that is displaced whenever the litigation is "serious" and the material "relevant" has "little value," *Lee*, 908 F.3d at 1187-88 (quoting *Tenney*, 341 U.S. at 377). After all, "[a] privilege that gives way whenever its contents become relevant or even 'highly relevant' to an opposing party's arguments cannot serve [its] purpose." *In re Itron, Inc.*, 883 F.3d 553, 563 (5th Cir. 2018). Information that does not meet that definition would likely not be admissible, and may not be discoverable, even without a privilege. Again, "[s]uch a defeatable 'privilege' is hardly a privilege at all." *Id.* at 562.

### 4.   Legislative privilege was not waived for the challenged documents.

Finally, the district court was wrong to conclude that the legislative privilege was waived for documents that were shared with "parties outside the legislature"—including officials from the Offices of the Attorney General, Secretary of State, and Lieutenant Governor, as well others who provide confidential information or advice for legislative purposes. ROA.10386-89.

**a.** The legislative privilege applies whenever the legislator or his agent was "acting in the sphere of legitimate legislative activity," *Tenney*, 341 U.S. at 376, and it "protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts," *Helstoski*, 442 U.S. at 489 (citation omitted). It "therefore covers . . . legislators' actions in the proposal, formulation, and passage of legislation." *Hubbard*, 803 F.3d at 1308. That necessarily includes "[m]eeting[s] with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation . . . [and] assist legislators in the discharge of their legislative duty." *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007). Indeed, "[m]eeting with 'interest' groups, professional or amateur, regardless of their motivation, is a part and parcel of the modern legislative procedures." *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980).

This conclusion is confirmed by examining analogous privileges, which protect conversations with third parties when necessary to encourage open and honest communication in aid of the societal goal that underscores the privilege. *See United States v. Pipkins*, 528 F.2d 559, 562-63 (5th Cir. 1976); *see also United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982) ("The scope of the attorney-client privilege is shaped by its purposes."). This can be seen particularly clearly with executive privilege and attorney-client privilege, both of which protect communications with third parties if necessary to serve their larger societal purpose.

For example, like the legislative privilege, the executive privilege exists to allow Presidents to rely on advisors to obtain the information and advice that is so vital to

serving the common good. *See In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) ("Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the [executive] privilege must apply both to the communications which these advisers solicited and received from others as well as those they authored themselves."). The most famous early example of this is likely the "kitchen cabinet" employed by President Jackson. Richard B. Latner, *The Kitchen Cabinet and Andrew Jackson's Advisory System*, 65 J. of Am. Hist. 367, 367 (1978). Even these advisors "must sometimes solicit information from" and provide information to "individuals outside the White House and the Executive Branch," including members of the Legislative branch.[9] To hold that such communications are not privileged because they involve individuals not directly employed by the Executive would be detrimental to the public interest. After all, good decisions require good information, and "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974).

Similarly, the attorney-client privilege also protects communications with third parties when those communications further the purposes of the attorney-client

---

[9] Op. of Paul D. Clement, Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys, 31 Op. O.L.C. 1, 5 (June 27, 2007), https://tinyurl.com/yc2rx3ds; *see also In re Sealed Case*, 121 F.3d at 751-52; Mem. Op. of Douglas W. Kmiec, Applicability of Executive Privilege to the Recommendations of Independent Agencies Regarding Presidential Approval or Veto of Legislation, 10 Op. O.L.C. 176, 178 (Dec. 22, 1986), https://tinyurl.com/3vc8wh33.

privilege—namely to encourage candid communications between attorneys and clients. For example, if the attorney and client do not speak the same language, then some sort of interpreter or translator is necessary. And there is "no significant difference" for purposes of privilege whether "the attorney sends a client speaking a foreign language to an interpreter," whether the attorney uses a "knowledgeable non-lawyer employee," whether a translator is "brought along by the client," or whether the attorney "sends the client to a non-lawyer proficient in [the client's language], with instructions to interview the client on the attorney's behalf and then render his own summary of the situation." *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961). Thus, the attorney-client "privilege must include all the persons who act as the attorney's agents" because their assistance is "indispensable to [the attorney's] work and the communications of the client [are] often necessarily committed to them by the attorney or by the client himself." *Id.*

In the end, plaintiffs' position, which the district court adopted, would make application of the legislative privilege turn on the formal employment status of third parties rather than the function those third parties serve. This is an analysis foreign to all analogous privileges: "[u]nder current legal theory, immunity attaches or does not attach depending on what kind of action was performed rather than on who performed the action." *Acevedo-Cordero v. Cordero-Santiago*, 958 F.2d 20, 23 (1st Cir. 1992).[10] Legislative privilege works the same way; its scope depends on the role these

---

[10] *Accord Lake Country Ests., Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405 n.30 (1979); *Butz v. Economou*, 438 U.S. 478, 511 (1978).

third parties play in facilitating societally desirable communications, not whether one party to those communications place them "on their payrolls and maintain[] them in their offices." *Kovel*, 296 F.2d at 921.

The district court erred in holding otherwise and in so doing discouraged the Texas Legislature from seeking information and advice about changes to the Election Code from the Secretary of State, who as the State's chief election officer serves as an information repository for how elections are run, Tex. Elec. Code § 31.003, and from the Attorney General, who as the State's lawyer is authorized to dispense advice regarding the current meaning of the Election Code, Tex. Const. art. IV, § 22. That error is severely problematic.

**b.** At a minimum, the district court erred in concluding that the Legislators waived the legislative privilege by communicating with staff in the Offices of the Lieutenant Governor and Attorney General because, in this context, it is far from clear that the Lieutenant Governor and Attorney General should be seen as anything other than a particular legislator's agent in the discharge of his legislative functions.

Under the Texas Constitution, the Lieutenant Governor serves as the President of the Texas Senate. *Id.* art. IV, § 16. The district court acknowledged that the Lieutenant Governor performs "extensive, enumerated legislative functions," but concluded that those functions were not implicated here because the Texas Senate Rules only allow the Lieutenant Governor to participate in debate and vote on bills when such legislation is pending before the Committee of the Whole Senate and here S.B. 1 was only considered in the State Affairs Committee. ROA.10391.

Leaving aside that some of the Senate's rules were suspended for S.B. 1, *e.g.*, S.J. of Tex., 87th Leg., 2d C.S. 6-7, 17-18 (2021), the district court's conclusion that the legislative privilege is waived for any communications by the Lieutenant Governor outside of the context of proceedings during the Committee of the Whole takes an unduly narrow view of the Lieutenant Governor's role in the legislative process. For example, the court ignored that the Senate Rules also empower the Lieutenant Governor to "work for or against any proposition before the Senate while on the floor," Tex. S. Rule 2.02(d), S. Res. 1, 87th Leg., 2d C.S. (2021), and to "give the casting vote" when the Senate is "equally divided." Tex. S. Rule 6.18, S. Res. 1, 87th Leg., 2d C.S. (2021). He is empowered to "decide all questions of order," Tex. S. Rule 1.01, S. Res. 1, 87th Leg., 2d C.S. (2021), which can determine whether a bill lives or dies in the fast-paced world of the Texas Legislature. *See, e.g.*, Becca Aaronson, *Texplainer: What Is a "Point of Order"?*, Texas Tribune (Mar. 25, 2011), https://tinyurl.com/5c6muwt6. Thus, the fact that S.B. 1 was not considered in the Committee of the Whole hardly proves that the Lieutenant Governor—who always presides over the Senate and who may have to vote on a bill—was not properly engaged in legislative activity when communicating with the Legislators about S.B. 1.

Similarly erroneous is the district court's conclusion that communications with the Office of the Attorney General waived the legislative privilege. ROA.10388-90. The Legislators do not dispute the district court's conclusion that the Attorney General does not automatically represent all Legislators. ROA.10388-89. But that should not have been the end of the court's analysis. Many legislators do not have their own counsel on staff, and the Attorney General is specifically empowered by Texas law

to provide advice to legislators under certain circumstances, on request. *See* Tex. Const. art. IV, § 22; Tex. Gov't Code §§ 402.010,.021, .042-043. As a result, the Attorney General is not an "outsider" in the same sense as a party representative or lobbyist. *Contra* ROA.10384. The district court's contrary conclusion frustrates the ability of legislators to seek legal advice regarding the effect of proposed legislation and thus hampers the ability of legislators to effectively discharge their legislative duties.

## II. Plaintiffs' Third-Party Discovery Requests Are Barred by Attorney-Client Privilege.

For similar reasons, the district court also erred in overriding the Legislators' attorney-client privilege with respect to "several dozen documents" in which the Legislators' staff communicated with attorneys in the Office of the Lieutenant Governor, the Office of the Attorney General, and the Texas Legislative Council. ROA.9114, 10394-95. The district court also concluded that the common-interest doctrine did not preserve the confidentiality of these documents because, in this Circuit, the doctrine only applies when parties have a common interest in "actual" or "potential" litigation, and no actual or threatened litigation existed at the time of those communications. ROA.10394-95. Alternatively, the Court held that "many" of the communications concern "facts, not legal advice," ROA.10395. Both conclusions were erroneous.

**A.** "Although occasionally termed a privilege itself, the common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person." *United States v.*

41

*BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). It "applies to communications made by the client or the client's 'lawyer to a lawyer representing another in a matter of common interest.'" *Cavallaro v. United States*, 284 F.3d 236, 249 (1st Cir. 2002) (quoting 3 *Weinstein's Federal Evidence* § 503.15[3] (J.M. McLaughlin, ed., 2d ed. 2002)).

That doctrine should be largely irrelevant to this case because, as discussed above (at 39-41), neither the Lieutenant Governor nor the Attorney General is a stranger to the attorney-client relationship; in this context they are agents of the Legislature, assisting the Legislators in the discharge of their legislative duties.

That agency relationship is even clearer with regard to the Texas Legislative Council—as the district court implicitly recognized when it concluded that communications between Legislators and the Council did not waive legislative privilege. ROA.10386 n.1. The district court should have applied the same logic to hold that communications with the Legislative Council did not waive the attorney-client privilege. Under Texas law, the Legislative Council "is an agency of the legislative branch of state government" governed by several members of the legislative branch, including the Lieutenant Governor, the Speaker of the House, six senators, and five members of the Texas House. Tex. Gov't Code § 323.001. It is charged with, among other things, "provid[ing] legal advice and other legal services to the legislature" and "assist[ing] the legislature in drafting proposed legislation." *Id.* § 323.006(a)(7)-(8). Under state law, communications between members of the Legislature or their staff and attorneys for the Texas Legislative Council are subject to the attorney-client privilege. *Id.* § 323.017(b). Thus, any communications by the Legislators with the

Texas Legislative Council, including the agency's attorneys, are confidential communications between a client and attorney—not between a third party and a client.

To the extent that the district court meant to abrogate the attorney-client privilege for communications between the Legislators and non-legal staff for the Texas Legislative Council, those non-legal staff are "agents" of the Legislators who assist in providing legal advice. As this Court has long held, "in appropriate circumstances the privilege may bar disclosures made by a client to non-lawyers who . . . had been employed as agents of an attorney." *Pipkins*, 528 F.2d at 562; *see also Kovel*, 296 F.2d at 921-22. Those circumstances are present here: the privilege log reveals that the Texas Legislative Council was consulted to assist with the drafting of the Legislature's election-integrity bill. *See, e.g.*, ROA.9287.

**B.** Even if the common-interest doctrine were implicated, the district court misapplied it. In this Circuit, "the two types of communications protected under [this rule] are: (1) communications between co-defendants in actual litigation and their counsel; and (2) communications between *potential* co-defendants and their counsel." *United States v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002) (quoting *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001)) (emphasis original). As for the latter category, "[c]ommunications between potential co-defendants and their counsel are only protected if there is a palpable threat of litigation at the time of the communication, rather than a mere awareness that one's questionable conduct might some day result in litigation." *Id.* (quotation omitted).

This Circuit's narrow view of the scope of the common-interest doctrine appears to stand alone, with at least five of its sister circuits instead holding that

"litigation need not be actual or imminent for communications to be within the common interest doctrine." *BDO Seidman, LLP*, 492 F.3d at 816 n.6. And as the Seventh Circuit has observed, this Circuit's "position runs contrary to the 'established [rule] that the attorney-client privilege is not limited to actions taken and advice obtained in the shadow of litigation'"—for example, the privilege applies to transactional attorneys who rarely, if ever, become involved in litigation. *Id.* (quoting *In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1390 (Fed. Cir. 1996)). The Legislators expressly reserve the right to seek en banc review to bring this Court's caselaw in line with other Circuits.

Nevertheless, even under this Circuit's current rule, the district court should not have dispensed with the Legislators' attorney-client privilege on the ground that the Legislators could not "plausibly claim that a threat of litigation existed at the time of the communications" concerning the forthcoming election-based legislation. ROA.10394-95. This contention ignores the context in which the Texas Legislature was operating. S.B. 1 was conceived as an omnibus overhaul to the Texas Election Code. *Supra* at 6-7. As discussed above (at 6), even today, there remain at least two challenges to parts of the Texas Election Code that were pending at the time of S.B. 1's passage. In 2021, the number of pending lawsuits that could be affected by changes to the Election Code was even higher. *E.g.*, *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669 (5th Cir. 2022) (challenge to Texas H.B. 25 elimination of straight-ticket voting). It is hardly surprising under such circumstances that members of the Legislature would want to confer with either the Attorney General or the legal staff of the Texas Legislative Council about the legal implications of draft bills.

Even if there were not pending litigation regarding Texas's Election Code, the palpable threat of litigation was certainly present. The underlying lawsuit in this case was initiated four days before the Governor even signed S.B. 1 into law. *Compare* ROA.56 (complaint challenging S.B. 1 filed on September 3, 2021) *with* S.J. of Tex., 87th Leg., 2d C.S. 268 (2021) (S.B. 1 signed by Governor on September 7, 2021).

More broadly, challenges to election-related legislation are recurrent. For example, legal challenges to election maps drawn during the once-a-decade redistricting process are filed as a matter of course and often persist well into the decade. *See LULAC v. Abbott*, No. 3:21-cv-00259 (W.D. Tex., filed Oct. 18, 2021) (challenge to maps drawn based on 2020 census); *Abbott v. Perez*, 138 S. Ct. 2305 (2018) (challenge to maps drawn based on 2010 census); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) (challenge to maps drawn based on 2000 census); *Bush v. Vera*, 517 U.S. 952 (1996) (challenge to maps drawn based on 1990 census). The same is true of legislation regulating the time, manner, and place of voting. *See, e.g.*, *Tex. Dem. Party v. Hughs*, 997 F.3d 288 (5th Cir. 2021) (challenge to Texas H.B. 1888 mobile or pop-up early voting prohibition); *Tex. Dem. Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) (challenge to Texas vote-by-mail rules under the Twenty-Sixth Amendment); *Veasey*, 830 F.3d at 216 (challenge to Texas S.B. 14 voter ID requirement). Indeed, election-based litigation is so ubiquitous that plaintiffs' counsel maintains a website to track this litigation across the country. *See* Democracy Docket, *About Us: What we Do*, https://www.democracydocket.com/about-us/ (last accessed June 21, 2022).

The argument that the Legislators, Lieutenant Governor, Attorney General, and Texas Legislative Council could not have had anything more than a "mere awareness" that S.B. 1 might "some day result in litigation," *Newell*, 315 F.3d at 525, cannot be squared with the reality of election-based legislation, which is always undertaken in the shadow of litigation.

**C.** Finally, the district court also erred in making the blanket statement that "many" of the documents subject to the attorney-client privilege concerned "facts, not legal advice," ROA.10395. There are only three[11] documents on the privilege log that fit the district court's description—"[c]orrespondence" with an attorney in the Office of the Attorney General "related to solicited information about incidents of voting misconduct, revealing legislator's mental impressions." ROA.9340, 9349. Even if those three documents did concern facts, not legal advice—which the Legislators dispute—this basis for dispensing with the privilege does not apply to the dozens of other documents over which the attorney-client privilege is asserted, and which indisputably concern legal advice "concerning drafting instructions and proposed language for" legislation. *See, e.g.*, ROA.10436-45.

---

[11] Those documents are labelled as "DOC_0000734," "DOC_0000740" and "DOC_0000619." ROA.9340, 9349.

## Conclusion

The Court should reverse the district court's order compelling the production of documents protected by the legislative privilege and attorney-client privilege.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

/s/ Lanora C. Pettit
Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

William F. Cole
Assistant Solicitor General

Counsel for Appellants

## CERTIFICATE OF SERVICE

On June 21, 2022, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,363 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rules 27(d)(1)(E) and 32(a)(5) and the type style requirements of Rules 27(d)(1)(E) and 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT

48